******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., dissenting. I respectfully dissent. I disagree with part I of the majority opinion and, in particular, the majority's interpretation of *Roper* v. *Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), *Graham* v. *Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), and *Miller* v. *Alabama*, U.S. , 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

I disagree with the majority's conclusion that the rationales of *Roper*, *Graham*, and *Miller*—that juvenile offenders are constitutionally different than adults because of their decreased culpability—apply with less force when the sentence imposed is not the death penalty or life without parole. Indeed, the majority omits language in *Miller* that expressly precludes its analysis: "[N]one of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific." *Miller* v. *Alabama*, supra, 132 S. Ct. 2465. In my view, and in the view of the Supreme Court of Iowa in *State* v. *Lyle*, 854 N.W.2d 378 (Iowa 2014), neither the crime nor its mandatory minimum punishment should be a factor in a sentencing court's ability to comply with the eighth amendment to the United States constitution and, therefore, a sentencing court possesses discretion to fashion a constitutionally permissible sentence, even if that sentence departs downward from a mandatory minimum sentence. In *Miller*, the United States Supreme Court agreed that a juvenile's features are "evident in the same way, and to the same degree" regardless of the crime or the punishment. *Miller* v. *Alabama*, supra, 2465. Additionally, I disagree with the majority's conclusion that a sentencing court always retains constitutionally sufficient sentencing discretion merely because it is free to impose a sentence harsher than the mandatory minimum set by the legislature.

Instead, I would conclude that the eighth amendment's prohibition against cruel and unusual punishment precludes imposition of *any* mandatory minimum sentence on a juvenile offender because such offender's status triggers the requirement of individualized, fully discretionary sentencing. Therefore, I respectfully dissent.

In part I of this opinion, I review the decisions of the United States Supreme Court in *Roper*, *Graham*, and *Miller*, and detail how those cases were applied by the Supreme Court of Iowa in *Lyle*. In part II of this opinion, I discuss the analysis proffered by the majority. In part III of this opinion, I explain how *Roper*, *Graham*, and *Miller* should have dictated a different outcome in the present case.

I

In *Roper*, *Graham*, and *Miller*, the United States Supreme Court examined juvenile sentencing through the lens of the eighth amendment to the United States constitution. In those cases, the court declared unconstitutional the imposition on juvenile offenders of the death penalty; *Roper* v. *Simmons*, supra, 543 U.S. 568; life without parole for nonhomicide offenses; *Graham* v. *Florida*, supra, 560 U.S. 82; and mandatory life without parole for homicide offenses. *Miller* v. *Alabama*, supra, 132 S. Ct. 2465. The court so concluded because of the marked physiological and psychological differences between juveniles and adults and, accordingly, the reduced penological justifications associated with sentencing juveniles as adults. The court's jurisprudence in these three cases leads to the inescapable conclusion, adopted by the Supreme Court of Iowa in *State* v. *Lyle*, supra, 854 N.W.2d 378, that individualized, fully discretionary sentencing of juvenile offenders, including the ability to depart downward from a mandatory minimum sentence, is the only way to comport with the eighth amendment's strictures and appropriately account for the ways in which juveniles differ from adults.

A

The United States Supreme Court's trilogy of juvenile sentencing cases explored the multitude of reasons why "children are constitutionally different from adults for purposes of sentencing." *Miller* v. *Alabama*, supra, 132 S. Ct. 2464.

The first of these cases, *Roper* v. *Simmons*, supra, 543 U.S. 568, highlighted the differences that exist between juveniles and adults when it concluded that the death penalty could not constitutionally be applied to juvenile offenders. The court noted "[t]hree general differences between juveniles under [eighteen] and adults . . . . First, as any parent knows and as the scientific and sociological studies . . . confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' " Id., 569. Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." Id. "The third broad difference is that the character of a juvenile is not as well formed as that of an adult." Id., 570.

The court in *Roper* noted that "[t]he susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' . . . The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would

be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' . . . [See L. Steinberg & E. Scott, "Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty," 58 Am. Psychologist 1009, 1014 (2003)] ('For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood')." (Citation omitted.) *Roper* v. *Simmons*, supra, 543 U.S. 570.

The Supreme Court in *Roper* concluded that "[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death. . . . It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. . . . As we understand it, this difficulty underlies the rule forbidding psychiatrists from diagnosing any patient under [eighteen] as having antisocial personality disorder . . . . If trained psychiatrists with the advantage of clinical testing and observation refrain, despite diagnostic expertise, from assessing any juvenile under [eighteen] as having antisocial personality disorder, we conclude that [s]tates should refrain from asking jurors to issue a far graver condemnation—that a juvenile offender merits the death penalty." (Citations omitted.) Id., 572–73.

Just five years later, in *Graham*, the Supreme Court reaffirmed its understanding of juveniles and expounded on its discussion of the differences between juveniles and adults, concluding that it is unconstitutional for juveniles to be discretionarily sentenced to life without parole for nonhomicide crimes. *Graham* v. *Florida*, supra, 560 U.S. 82. The court noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence." Id., 68. "It follows that, when com-

pared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis." Id., 69.

The court in *Graham* also cautioned that the immaturity of juveniles contributes to "special difficulties encountered by counsel in juvenile representation. . . . [T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings. Juveniles mistrust adults and have limited understandings of the criminal justice system and the roles of the institutional actors within it. They are less likely than adults to work effectively with their lawyers to aid in their defense. . . . Difficulty in weighing long-term consequences; a corresponding impulsiveness; and reluctance to trust defense counsel seen as part of the adult world a rebellious youth rejects, all can lead to poor decisions by one charged with a juvenile offense. . . . These factors are likely to impair the quality of a juvenile defendant's representation." (Citations omitted.) Id., 78.

Two years later, the Supreme Court yet again considered the psychological and physiological differences between juveniles and adults in *Miller*, concluding that juveniles convicted of homicide crimes cannot constitutionally be sentenced to mandatory life without parole. *Miller* v. *Alabama*, supra, 132 S. Ct. 2469. The court in *Miller* explained: "The evidence presented to us in these cases indicates that the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger." Id., 2464 n.5. The court, quoting an amicus brief filed by the American Psychological Association, then noted that "[i]t is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance . . . ." (Internal quotation marks omitted.) Id., 2465 n.5. The conclusions in "*Graham* and *Roper* and [the] individualized sentencing cases alike teach that in imposing a [s]tate's harshest penalties, a sentencer misses too much if he treats every child as an adult. . . . Indeed, [mandatory life without parole] ignores that [the juvenile offender] might have been charged and convicted of a lesser offense if not for the incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." Id., 2468. The court in *Miller* noted that "none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. Those features are evident in the same way, and to the same degree, when (as in both cases here) a botched robbery turns into a killing. So *Graham*'s reasoning implicates any [life without parole] sentence imposed on a juvenile, even as its categorical bar relates only to nonhomi-

cide offenses." Id., 2465.

The *Roper*, *Graham*, and *Miller* cases thus chronicle the Supreme Court's ever strengthening conclusion that juveniles cannot be treated as adults in the sentencing context.

### B

After expounding on the physiological and psychological differences inherent in juveniles, the decisions of the Supreme Court in *Roper*, *Graham*, and *Miller* each concluded that such differences erode much of the penological justifications for harsh punishments on juveniles. Specifically, the court discussed how retribution, deterrence, incapacitation, and rehabilitation may not squarely justify harsh punishments of juveniles in all cases. The court's rationales over the span of years encompassing *Roper*, *Graham*, and *Miller* lead to the conclusion that an individualized, fully discretionary sentencing is the only process by which a sentencing court can appropriately account for the differences inherent in juveniles.

The first penological justification, retribution, could not be justified as "strong[ly] with a minor [charged with a homicide offense] as with an adult. Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Roper* v. *Simmons*, supra, 543 U.S. 571. As to nonhomicide crimes, the court in *Graham* noted that "retribution does not justify imposing the second most severe penalty [of life without parole] on the less culpable juvenile nonhomicide offender." *Graham* v. *Florida*, supra, 560 U.S. 72. Even though "[s]ociety is entitled to impose severe sanctions on a juvenile nonhomicide offender to express its condemnation of the crime and to seek restoration of the moral imbalance caused by the offense . . . '[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender.' [*Tison* v. *Arizona*, 481 U.S. 137, 149, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987)]." *Graham* v. *Florida*, supra, 71. The personal culpability of such a juvenile offender may be questionable given the fact that his or her "transgression 'is not as morally reprehensible as that of an adult.' " Id., 68, quoting *Thompson* v. *Oklahoma*, 487 U.S. 815, 835, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988) (plurality opinion). Even with respect to homicide crimes, retribution could not justify imposition of mandatory life without parole because a juvenile's "moral culpability" and "blameworthiness . . . '[are] not as strong with a minor as with an adult.' " *Miller* v. *Alabama*, supra, 132 S. Ct. 2465, quoting *Graham* v. *Florida*, supra, 71.

The second penological justification, deterrence of future crime committed by juveniles, "is premised on

the belief that one evaluates the consequences of one's actions . . . ." *State* v. *Riley*, 140 Conn. App. 1, 30, 58 A.3d 304 (2013) (*Borden, J.*, dissenting). With respect to deterrence, the United States Supreme Court questioned "whether the death penalty has a significant or even measurable deterrent effect on juveniles . . . . [T]he absence of evidence of deterrent effect is of special concern because the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence." (Citations omitted.) *Roper* v. *Simmons*, supra, 543 U.S. 571. The court reasoned that, "[t]o the extent the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person." Id., 572. As with retribution, the deterrence rationale similarly did not hold up with respect to life without parole. "Because juveniles' 'lack of maturity and underdeveloped sense of responsibility . . . often result in impetuous and ill-considered actions and decisions,' *Johnson* v. *Texas*, [509 U.S. 350, 367, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993)], they are less likely to take a possible punishment into consideration when making decisions. This is particularly so when that punishment is rarely imposed. That the sentence deters in a few cases is perhaps plausible . . . [but] any limited deterrent effect provided by life without parole is not enough to justify the sentence." (Citation omitted.) *Graham* v. *Florida*, supra, 560 U.S. 72; see also *Miller* v. *Alabama*, supra, 132 S. Ct. 2465.

The third penological justification for punishment, incapacitation, addresses recidivism. "Recidivism is a serious risk to public safety, and so incapacitation is an important goal." *Graham* v. *Florida*, supra, 560 U.S. 72. Imposition of life without parole operates on the "assumption that the juvenile offender forever will be a danger to society [and] requires the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable. 'It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " Id., 72–73, quoting *Roper* v. *Simmons*, supra, 543 U.S. 573. "Even if the [s]tate's judgment that [a juvenile offender] was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence [of life without parole] was still disproportionate because that judgment was made at the outset. A life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity. Incapacitation cannot override all other considerations, lest the [e]ighth [a]mendment's rule against disproportionate sentences be a nullity." *Graham* v. *Florida*, supra, 73; see also *Miller* v. *Alabama*, supra,

132 S. Ct. 2465.

The last penological justification for punishment, rehabilitation, implicates our legislature's judgment. The court in *Graham* noted that "[i]t is for legislatures to determine what rehabilitative techniques are appropriate and effective." *Graham* v. *Florida*, supra, 560 U.S. 73–74. Although "the fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter, is properly within the province of legislatures, not courts"; (internal quotation marks omitted) *State* v. *Higgins*, 265 Conn. 35, 63, 826 A.2d 1126 (2003), quoting *Harmelin* v. *Michigan*, 501 U.S. 957, 998, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991); the United States Supreme Court nevertheless found cause to second-guess the wisdom of the legislature in imposing life without parole on nonhomicide juvenile offenders because doing so entailed "the [s]tate mak[-ing] an irrevocable judgment about that person's value and place in society. This judgment is not appropriate in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability." *Graham* v. *Florida*, supra, 74; see also *Miller* v. *Alabama*, supra, 132 S. Ct. 2465.

C

Year after year, the Supreme Court has chipped away at sentences that harshly punish juveniles, but only if those sentences—or sentencing schemes—fail to allow a sentencing court to consider the fundamental differences of juvenile offenders before imposing the sentence or to meaningfully tailor the sentence to suit those differences. This process of erosion began with the prohibition of the death penalty in *Roper*, continued with the prohibition of life without parole for nonhomicide offenders in *Graham*, and more recently continued with the prohibition of mandatory life without parole in *Miller*. The common theme of these cases is the need for individualized, fully discretionary sentencing of all juvenile offenders.

*Roper*, *Graham*, and *Miller* each focus on the importance of a sentencing court's ability to weigh the factors of youth and determine whether those factors compel a lesser sentence. After all, "[t]he concept of proportionality is central to the [e]ighth [a]mendment. Embodied in the [c]onstitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " *Graham* v. *Florida*, supra, 560 U.S. 59, quoting *Weems* v. *United States*, 217 U.S. 349, 367, 30 S. Ct. 544, 54 L. Ed. 793 (1910).

A juvenile's sentence would be disproportionate and, thus, violate the eighth amendment if that sentence were the product of "mandatory penalty schemes . . . [that] prevent the sentencer from taking account of these central considerations [of youth]. By removing

youth from the balance—by subjecting a juvenile to the same [life without parole] sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment *proportionately* punishes a juvenile offender. [This lack of proportionality] contravenes *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a [s]tate's most severe penalties on juvenile offenders cannot proceed as though they were not children." (Emphasis added.) *Miller* v. *Alabama*, supra, 132 S. Ct. 2466. "Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other— the [seventeen year old] and the [fourteen year old], the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one." Id., 2467–68. "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." Id., 2469.

Other state courts have similarly noted the importance of individualized, fully discretionary sentencing of juvenile offenders. When vacating a sentence of life without parole imposed on a juvenile convicted of first degree murder, the Wyoming Supreme Court stated that "[t]he key to achieving proportional punishment is for the sentencing court to inquire into the facts and circumstances surrounding the juvenile offender and the crime." *Bear Cloud* v. *State*, 294 P.3d 36, 46 (Wyo. 2013); see also *Bear Cloud* v. *State*, 334 P.3d 132, 141–42 (Wyo. 2014) ("[w]e hold that the teachings of [*Roper, Graham,* and *Miller* require] sentencing courts to provide an individualized sentencing hearing to weigh the factors for determining a juvenile's 'diminished culpability' "). As I discuss subsequently in this opinion, a similar conclusion was reached by the Supreme Court of Iowa in *State* v. *Lyle*, supra, 854 N.W.2d 378. See part I D of this opinion.

In order to comply with the eighth amendment's strictures, in my view, this court must find unconstitutional all mandatory minimum sentences imposed upon juveniles tried as adults, for such mandatory sentences can never properly take into account the effect of juvenile differences on the culpability of the juvenile and, thus, the proportionality of the sentence imposed. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2470 ("[w]e have by now held on multiple occasions that a sentencing rule permissible for adults may not be so for children"). After all, a juvenile's decreased culpability neither depends on the crime charged; see id., 2465 ("[N]one of what [*Graham*] said about children—about their distinctive [and transitory] mental traits and environmental vulnerabilities—is crime-specific. Those features are evident in the same way, and to the same degree, when [as in

both cases here] a botched robbery turns into a killing."); nor the particular penalty imposed. See id., 2471 ("Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty. And in so requiring, our decision flows straightforwardly from our precedents: specifically, the principle of *Roper*, *Graham*, and our individualized sentencing cases that youth matters for purposes of meting out the law's most serious punishments.").

It is therefore clear to me that the rationales of *Roper*, *Graham*, and *Miller* mandate that a sentencing court be permitted to give effect to the protections afforded by the eighth amendment with individualized, fully discretionary sentencing of juvenile offenders, which include, if warranted, the ability to depart downward from a mandatory minimum sentence. The United States Supreme Court's jurisprudence requiring individualized, fully discretionary sentencing applies to all juvenile offenders with equal force, regardless of the crimes for which such offenders are convicted and the punishments associated therewith.

### D

The Supreme Court of Iowa has concluded, as I would, that the rationales of *Roper*, *Graham*, and *Miller* render unconstitutional all mandatory minimum sentences imposed on juvenile offenders. *State* v. *Lyle*, supra, 854 N.W.2d 403–404. The defendant in *Lyle*, a juvenile at the time of his offense, had been charged as an adult with second degree robbery after a fight in a high school parking lot.[1] Id. He challenged an Iowa statute that precluded his eligibility for parole until he had served a minimum of seven-tenths of the sentence imposed. Id. The Supreme Court of Iowa held that the mandatory minimum sentence statute, as applied to juveniles, violated the juvenile defendant's right to be free from cruel and unusual punishment pursuant to the Iowa constitution, which mirrors the language of the federal eighth amendment in that it provides that "[e]xcessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted." (Internal quotation marks omitted.) Id., 383. In coming to its conclusion, the court "follow[ed] the federal analytical framework" for eighth amendment jurisprudence, though it relied upon the Iowa constitution's "prohibition against cruel and unusual punishment in reaching [its] conclusion." Id., 384.

The Supreme Court of Iowa began by interpreting the precedents set by *Roper*, *Graham*, and *Miller*, particularly the framework under which to analyze the defendant's eighth amendment challenge to the mandatory minimum sentence. The court identified two lines

of United States Supreme Court precedent: (1) cases addressing the proportionality of a sentence of imprisonment for a term of years given all the circumstances in a particular case; see, e.g., *Harmelin* v. *Michigan*, supra, 501 U.S. 957; *Solem* v. *Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983); and (2) cases implementing proportionality by imposing a categorical restriction on a certain type of punishment, on the basis of (A) the nature of the offense; see, e.g., *Kennedy* v. *Louisiana*, 554 U.S. 407, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008); (B) the characteristics of the offender; see, e.g., *Roper* v. *Simmons*, supra, 543 U.S. 551; *Atkins* v. *Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); or, (C) as in *Graham* and *Miller*, the sentencing practice implicating the characteristics of the offender. *State* v. *Lyle*, supra, 854 N.W.2d 385–86; see *Graham* v. *Florida*, supra, 560 U.S. 61 ("[H]ere a sentencing practice itself is in question. This case implicates a particular type of sentence as it applies to an entire class of offenders . . . ."); see also *Miller* v. *Alabama*, supra, 132 S. Ct. 2471. The court in *Lyle* categorized the defendant's challenge to the mandatory minimum sentence, as applied to juveniles, into that last category: "a categorical challenge to a [term of years] sentence based on the underlying sentence practice." *State* v. *Lyle*, supra, 385.

The court in *Lyle* then synthesized *Roper*, *Graham*, and *Miller*, as well as its own jurisprudence interpreting those three cases. See *State* v. *Ragland*, 836 N.W.2d 107, 109–10 (Iowa 2013) (unconstitutional sixty year sentence); *State* v. *Pearson*, 836 N.W.2d 88, 96 (Iowa 2013) (unconstitutional thirty-five year sentence); *State* v. *Null*, 836 N.W.2d 41, 45 (Iowa 2013) (unconstitutional fifty-two year sentence). Though recognizing that the sentences involved in *Roper*, *Graham*, and *Miller* had been the state's harshest penalties—the death penalty and life without parole—the Supreme Court of Iowa interpreted *Roper*, *Graham*, and *Miller* as requiring the invalidation of "a sentence with parole that is the *practical equivalent* of a life sentence without parole." (Emphasis added.) *State* v. *Ragland*, supra, 121. In its view, the rationales of *Roper*, *Graham*, and *Miller* did not cease to apply merely because of the label attached to any particular sentence: "[T]here was no meaningful difference between a mandatory [life without parole] sentence—commanding the juvenile to spend the entirety of his life in prison and then die there—and a sentence styled as a mere mandatory term of years that, as a practical matter, would obtain the same result." *State* v. *Lyle*, supra, 854 N.W.2d 395. The court continued: "While emerging neuroscience painted a compelling picture of the juvenile's diminished culpability 'in the context of the death penalty and [life without parole] sentences, [we recognized that the same reasoning] also applies, perhaps more so, in the context of lesser penalties as well.'" Id., 396, quoting *State* v. *Pearson*,

supra, 98.

It followed that, if the court in *Lyle* truly recognized the veracity of the rationales of *Roper*, *Graham*, and *Miller*, "children are constitutionally different from adults for purposes of sentencing" because of their diminished culpability; *Miller* v. *Alabama*, supra, 132 S. Ct. 2464; with respect to sentences that fell short of the state's harshest sentences, the court must also recognize these same rationales during "the sentencing of juveniles according to [other] statutorily required mandatory minimums [because they, too, do] not adequately serve the legitimate penological objectives in light of the child's categorically diminished culpability." *State* v. *Lyle*, supra, 854 N.W.2d 398. "[T]he [United States] Supreme Court has emphasized [in *Miller*] that nothing it has said [about juveniles] is 'crime-specific,' suggesting the natural concomitant that what it said is not punishment-specific either." Id., 399.

Therefore, the court in *Lyle* concluded, it was the defendant's status as a juvenile and not the sentence's label or length that triggered the constitutional protections of *Roper*, *Graham*, and *Miller*. "We must comply with the spirit of *Miller* . . . and to do so requires us to conclude [that its] reasoning applies to even a short sentence that deprives the [sentencing] court of discretion in crafting a punishment that serves the best interests of the child and of society." Id., 402; see also *Miller* v. *Alabama*, supra, 132 S. Ct. 2470 ("We have by now held on multiple occasions that a sentencing rule permissible for adults may not be so for children. . . . So if . . . 'death is different,' children are different too. Indeed, it is the odd legal rule that does *not* have some form of exception for children." [Citations omitted; emphasis in original.]).

The court in *Lyle*, like the United States Supreme Court in *Roper*, *Graham*, and *Miller*, then analyzed the penological justifications for sentencing juveniles to mandatory terms, concluding that, "[s]imply put, attempting to mete out a given punishment to a juvenile for retributive purposes irrespective of an individualized analysis of the juvenile's categorically diminished culpability is an irrational exercise." *State* v. *Lyle*, supra, 854 N.W.2d 399. As for deterrence, "[i]f a juvenile will not engage in the kind of cost-benefit analysis involving the death penalty that may deter [him or her] from committing a crime, there is no reason to believe a comparatively minor sentence of a term of years subject to a mandatory minimum will do so." Id. Finally, "[r]ehabilitation and incapacitation *can* justify criminally punishing juveniles, but mandatory minimums do not further these objectives in a way that adequately protects the rights of juveniles within the context of the constitutional protection from the imposition of cruel and unusual punishment for a juvenile." (Emphasis in original.) Id.

"Mandatory minimum sentences for juveniles are simply too punitive for what we know about juveniles"; id., 400; because "our constitutional prohibition against cruel and unusual punishment . . . stirred by what we all know about child development demands some assurance that imprisonment is actually appropriate and necessary. There is no other area of the law in which our laws write off children based only on a category of conduct without considering all background facts and circumstances." Id., 401. Therefore, "[m]andatory minimum sentencing results in cruel and unusual punishment due to the differences between children and adults. This rationale applies to all crimes, and no principled basis exists to cabin the protection only for the most serious crimes." Id., 402.

The court in *Lyle* thus concluded that its mandatory transfer statute requiring certain juveniles to be tried as adults, combined with mandatory minimum sentences, did not allow judges "to carefully consider all of the circumstances of each case to craft an appropriate sentence and give each juvenile the individual sentencing attention [he or she] deserve[s] and our constitution demands." Id., 403. The court in *Lyle* interpreted *Graham* and *Miller* as "properly read to support a new sentencing framework that reconsiders mandatory sentencing for all children." Id., 402. Allowing a sentencing court to depart downward from a mandatory minimum sentence, the court reasoned, "carries with it the advantage of simultaneously being more flexible and responsible to the demands of justice than outright prohibition of a particular penalty while also providing real and substantial protection for the offender's right to be sentenced accurately according to [the juvenile's actual] culpability and prospects for rehabilitation." Id., 386.

Finally, the court concluded by noting that its decision did not prohibit the imposition of sentences set forth by the legislature. Contrary to claims that invalidation of mandatory minimum sentences imposed on juveniles would cause upheaval in the criminal courts, "juveniles can still be sentenced to long terms of imprisonment, but not mandatorily." Id., 401. "[T]he holding in this case does not prohibit judges from sentencing juveniles to prison for the length of time identified by the legislature for the crime committed, nor does it prohibit the legislature from imposing a minimum time that youthful offenders must serve in prison before being eligible for parole. [The constitution] only prohibits the one-size-fits-all mandatory sentencing for juveniles. Our constitution demands that we do better for youthful offenders—all youthful offenders, not just those who commit the most serious crimes." Id., 403. The court thus ordered the resentencing of the defendant in *Lyle* "so a judge can at least consider [another] sentencing option . . . ." Id. "On remand, judges will do what they have taken an oath to do. They will apply

the law fairly and impartially, without fear. They will sentence those juvenile offenders to the maximum sentence if warranted and to a lesser sentence if warranted." Id., 404.

## II

Having set forth the relevant precedent, I now turn to the analysis proffered by the majority. The majority begins by discussing the well established principle that, in sentencing, juvenile offenders are constitutionally different from adults because of their lesser culpability. The majority then, however, distinguishes *Roper, Graham*, and *Miller* from the present case, concluding that there was no eighth amendment violation because "[t]he defendant's sentences not only were far less severe than the sentences at issue in *Roper, Graham* and *Miller*, but [they also] were consistent with the principle of proportionality at the heart of the eighth amendment protection because the mandatory minimum requirements, while limiting the trial court's discretion to some degree, still left the court with broad discretion to fashion an appropriate sentence that accounted for the defendant's youth and immaturity when he committed the crimes." The majority then undertakes an analysis of the defendant's eighth amendment claim that is neither a gross disproportionality analysis nor a categorical analysis.

I respectfully disagree with the majority opinion for several reasons. First, I disagree with the majority's conclusion that *Roper, Graham*, and *Miller* are distinguishable because neither the death penalty nor life without parole are at issue in the present case. Second, I disagree with the majority's contention that the trial court retained constitutionally sufficient discretion merely because the trial court retained discretion to sentence the defendant, Taylor G., to a longer term of imprisonment. Third, I would have analyzed this claim using the categorical approach set forth in *Graham* and followed in *Miller* by considering objective indicia of society's standards, as expressed in legislative enactments and state practice, and whether, in this court's own independent judgment, the punishment in question violates the constitution in light of the standards elaborated by controlling precedents and by the United States Supreme Court's understanding and interpretation of the eighth amendment's text, history, meaning, and purpose. See e.g., *State* v. *Lyle*, supra, 854 N.W.2d 378; *Ellmaker* v. *State*, 329 P.3d 1253 (Kan. App. 2014).

I address each of these points in turn.

## A

I first disagree with the majority's conclusion that *Roper, Graham*, and *Miller* are distinguishable from the present case merely because the defendant's punishment—a term of years—is less severe than the sentences at issue in *Roper, Graham*, and *Miller* (i.e., not

the death penalty or life without parole). The majority explains that, in *Roper, Graham*, and *Miller*, the United States Supreme Court "concluded there was a constitutional violation because the sentences consisted of death or life imprisonment without the possibility of parole, the two most severe punishments courts are able to impose." I respectfully disagree. In *Roper, Graham*, and *Miller*, the court concluded that there had been constitutional violations because " 'objective indicia of society's standards, as expressed in legislative enactments and state practice' " determined that there was a "national consensus against the sentencing practice at issue"—namely, the practice of sentencing juveniles pursuant to sentencing schemes crafted for adults—and because the court, in its independent judgments and guided by " 'the standards elaborated by controlling precedents and by the [c]ourt's own understanding and interpretation of the [e]ighth amendment's text, history, meaning, and purpose,' " determined that the punishments at issue violated the constitution. *Graham* v. *Florida*, supra, 560 U.S. 61.

*Roper, Graham*, and *Miller* did not hinge their analyses of the eighth amendment's protections solely on the severity of the punishment involved. See id. ("a threshold comparison between the severity of the penalty and the gravity of the crime does not advance the analysis"). To be sure, "the severity of the punishment in question"; id., 67; informed the analysis, but it was not dispositive as the majority would suggest. The court in *Miller* expressly noted that the trigger for heightened eighth amendment protection in these juvenile cases is not the severity of the punishment, but rather the " 'offender's age' . . . ." *Miller* v. *Alabama*, supra, 132 S. Ct. 2462, citing *Graham* v. *Florida*, supra, 560 U.S. 76; see *State* v. *Allen*, 289 Conn. 550, 585, 958 A.2d 1214 (2008) ("[t]he eighth amendment affords heightened significance to the 'diminished culpability' of juveniles"); see also *Miller* v. *Alabama*, supra, 2470 ("We have by now held on multiple occasions that a sentencing rule permissible for adults may not be so for children. . . . So if . . . 'death is different,' children are different too. Indeed, it is the odd legal rule that does *not* have some form of exception for children." [Citations omitted; emphasis in original.]). The court in *Miller* expressly stated that "none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific." *Miller* v. *Alabama*, supra, 2465.

In my view, because it is the juvenile offender's age that triggers the United States Supreme Court's specific eighth amendment analysis and heightened eighth amendment protection, and because neither the characteristics of juveniles nor the eighth amendment's protections differ on the basis of the crime charged, it follows that the eighth amendment's protections *with respect to juvenile offenders* do not differ on the basis of the

*punishment* imposed. "[T]he Supreme Court has emphasized [in *Miller*] that nothing it has said [about juveniles] is 'crime-specific,' suggesting the natural concomitant that what it said is not punishment-specific either." *State* v. *Lyle*, supra, 854 N.W.2d 399, quoting *Miller* v. *Alabama*, supra, 132 S. Ct. 2465. A juvenile's traits bear on his or her culpability regardless of the crime charged, which then bears on the proportionality of the sentence imposed: "[a juvenile's] features are evident in the same way, and to the same degree" regardless of the crime committed. *Miller* v. *Alabama*, supra, 2465. As the Supreme Court of Iowa concluded, I, too, would conclude that the same is true regardless of the range of punishment to which a juvenile is exposed. See *State* v. *Lyle*, supra, 402 (recognizing its duty to "comply with the spirit of *Miller* . . . and [noted that doing] so requires us to conclude [its] reasoning applies to even a short sentence that deprives the [sentencing] court of discretion in crafting a punishment that serves the best interests of the child and of society"). Neither the crime, nor its mandatory minimum punishment should bear on a sentencing court's ability to comply with the eighth amendment or, therefore, a sentencing court's discretion to fashion a constitutionally permissible sentence, even if that sentence departs downward from a mandatory minimum sentence.

Nevertheless, the majority concludes that the sentence in the present case, not being one of those two most severe penalties, does "not implicate the factors deemed unacceptable in *Roper* . . . ." The majority then defines the "factors" the court in *Roper* "deemed unacceptable" in imposing the death penalty on juvenile offenders as "the futility of rehabilitation and the permanent deprivation of all hope to become a productive member of society, both of which occur when the court is prevented from taking a second look at the incarcerated offender's demonstrated growth and maturity." I respectfully disagree with the majority's analysis of *Roper*.

The court in *Roper* utilized the "factors" identified by the majority—factors illustrating why the death penalty is so severe—in discussing why, categorically, a sentencing court's *discretionary imposition of the death penalty* on a juvenile offender should be barred. The sentencing scheme at issue in *Roper* was not mandatory in nature, but rather a discretionary one that allowed a judge or jury to decide, on a case-by-case basis, that a harsher—indeed, the harshest—penalty should be imposed on a juvenile defendant despite the defendant's youth. The court concluded that, although sentencing courts could undertake case-by-case analyses before imposing the death penalty on juvenile offenders, and although sentencing courts generally "seek with diligence and professionalism to take account of the human existence of the offender and

the just demands of a wronged society"; *Graham* v. *Florida*, supra, 560 U.S. 77; a categorical bar against imposition of the death penalty was necessary because even "expert psychologists [struggle] to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper* v. *Simmons*, supra, 543 U.S. 573; id., 572–73 ("[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability").

The court in *Roper* thus deemed unacceptable *any likelihood* that, despite a discretionary sentencing scheme that allowed a sentencing court to impose the most severe penalty—the death penalty—after a careful review of all of the particular circumstances in a particular case, a sentencing court could still get it wrong. Put another way, categorically barring the discretionary imposition of the harshest penalty on juveniles was constitutionally necessary because, although discretionary sentencing works most of the time, the court's confidence in the sentencing court's ability to accurately and correctly gauge the juvenile's culpability *in every case* in which it discretionarily imposed the harshest penalty was outweighed by the risk of disproportionate punishment imposed on a juvenile *in even one case*, given the severity of the penalty and the difficulty in accurately identifying a juvenile's culpability. Thus, the "factors" cited by the majority militated in favor of *removing the discretion* of any sentencing court to impose the upper limit of the range to which a juvenile is exposed, the state's harshest penalty, in order to avoid the possibility of a disproportionate sentence.

It does not follow, however, that the lack of such "factors" in the present case—because the harshest penalties are not at issue and thus there is no impermissible risk of discretionarily imposing the harshest penalties—means that under *Roper*, *Graham*, or *Miller* the United States Supreme Court would refuse to vest sentencing courts with the discretion to modify mandatory minimum sentences *downward* in order to avoid the impermissible imposition of overly harsh, even if not the harshest, penalties. The court's cases do not support such a conclusion. This case is not about usurping discretion from the sentencing court, as was the case in *Roper* and *Graham*, to impose a penalty at the upper limits of the total penalty to which the defendant is already exposed; instead, this case is about *granting* a sentencing court the discretion that it otherwise lacks to impose a *lesser* sentence than the sentence to which the defendant is mandatorily exposed by the legislature.

In other words, where *Roper* prevents a sentencing court from getting it wrong by imposing the harshest penalty in a discretionary sentencing scheme, *Miller*

empowers a sentencing court to get it right by vesting it with the discretion to impose a lesser penalty in a mandatory sentencing scheme. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2469 n.8 ("Our holding requires fact-finders . . . to take into account the differences among defendants and crimes. By contrast, [mandatory] sentencing schemes . . . altogether preclude considering [the] factors [of youth]."). In my view, the United States Supreme Court's categorical bans on species of punishments, despite the availability of discretionary sentencing in those cases, only bolsters the argument for discretionary sentencing in the present case: the court would not have taken the harshest penalty off the table and then have precluded a sentencing court's ability, on a case-by-case basis, to exercise *any* discretion in the other direction—the direction of a lesser penalty—should the sentencing court determine, after carefully undertaking an analysis of the juvenile's maturity, that a *lesser* sentence were warranted in order to *avoid* an eighth amendment violation.

The majority does state that "deprivation of liberty for any amount of time, including a single year, is not insignificant . . . ." I agree. See *Gonzalez* v. *Commissioner of Correction*, 308 Conn. 463, 482–83, 68 A.3d 624 (2013) ("there is nothing more critical than the denial of liberty, even if the liberty interest is one day in jail"). The majority thereafter implies, however, that it cannot safeguard against the deprivation of liberty in this case because of the factual differences between the present case and *Roper*, *Graham*, and *Miller*. The majority implies that the rationales of *Roper*, *Graham*, and *Miller*—that juvenile offenders are constitutionally different than adults because of their decreased culpability—apply with less force when the sentence imposed is not the death penalty or life without parole. I respectfully disagree. See part I of this opinion; see also *Furman* v. *Georgia*, 408 U.S. 238, 329, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Marshall, J., concurring) ("[p]erhaps the most important principle in analyzing 'cruel and unusual' punishment questions is one that is reiterated again and again in the prior opinions of the [c]ourt: i.e., the cruel and unusual language 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society' "); *State* v. *Lyle*, supra, 854 N.W.2d 396 ("emerging neuroscience paint[s] a compelling picture of the juvenile's diminished culpability 'in the context of the death penalty and [life without parole] sentences, [and] it also applies, perhaps more so, in the context of lesser penalties as well' "), quoting *State* v. *Pearson*, supra, 836 N.W.2d 98.

If this court truly recognizes the veracity of the rationales of *Roper*, *Graham*, and *Miller*—that "children are constitutionally different from adults for purposes of sentencing" because of their diminished culpability; *Miller* v. *Alabama*, supra, 132 S. Ct. 2464; then this court must also recognize these same rationales in the present

case despite the fact that the sentence at issue is not the harshest sentence possible. The discretionary sentencing requirement set forth in *Miller*, meant to meaningfully account for the mitigating qualities of youth, is equally applicable to all mandatory sentences, regardless of their label or length, "which by definition remove a judge's or jury's discretion . . . ." Id., 2471 n.10.

Applying *Miller* to the present case would not preclude sentencing courts from imposing sentences on juvenile offenders that adhere to the once mandatory sentences propounded by the legislature. Applying *Miller* merely permits sentencing courts to do so, or not, in their full discretion and in accordance with our eighth amendment jurisprudence giving effect to what we know about juveniles.

## B

I next disagree with the majority's conclusion that the defendant's eighth amendment challenge fails because the sentencing court retained constitutionally sufficient discretion "to choose from a wide range of sentencing possibilities that equaled or exceeded the minimum term of imprisonment." A sentencing court's mere ability to impose a sentence *harsher* than the mandatory minimum does not satisfy the mandates of *Roper*, *Graham*, and *Miller*, which require that a sentencing court take into consideration a juvenile's unique characteristics in each case and, if warranted, depart downward from a mandatory minimum sentence in order to give effect to its consideration of the juvenile's youth. Moreover, it does not comport with our state constitution, which affords greater rights for eighth amendment purposes than the federal constitution.

The majority claims that the sentencing court had sufficient discretion to take the defendant's qualities of youth into account because it could have sentenced the defendant to a greater penalty than that to which he had been sentenced. This argument—that discretion to sentence above the floor renders the floor less important under the constitution—has already been explicitly rejected by the United States Supreme Court in an analogous context.

In *Alleyne* v. *United States*,     U.S.    , 133 S. Ct. 2151, 2160, 186 L. Ed. 2d 314 (2013), the United States Supreme Court discussed whether the sixth amendment required a prosecutor to prove, beyond a reasonable doubt, facts with respect to a sentencing enhancement that increased the mandatory minimum sentence to which a defendant was already exposed. The court in *Alleyne* noted that, in a prior case, it had drawn "a distinction between 'facts increasing the defendant's minimum sentence and facts extending the sentence beyond the statutory maximum,' " concluding that facts increasing the minimum sentence by way of a sentencing enhancement needed only to be proven by a prepon-

derance of the evidence. Id., 2158, quoting *Harris* v. *United States*, 536 U.S. 545, 566, 122 S. Ct. 2406, 153 L. Ed. 2d 524 (2002). In *Harris*, the court had reasoned that, where the facts authorizing the defendant's original sentencing range, without regard to any sentencing enhancements, were proven beyond a reasonable doubt, a sentencing court, in its discretion, could impose a sentence in the middle of such range. *Harris* v. *United States*, supra, 563. Accordingly, under *Harris*, if a sentencing enhancement, proven only by a preponderance of the evidence, subsequently raised the mandatory minimum sentence and such minimum were in the middle of the range already authorized by the original sentencing range, there would be no sixth amendment violation because the new sentencing range "merely limited the judge's 'choices within the authorized range.' " *Alleyne* v. *United States*, supra, 2157–58, quoting *Harris* v. *United States*, supra, 567.

The court in *Alleyne* held that *Harris* had been wrongly decided. *Alleyne* v. *United States*, supra, 133 S. Ct. 2158. The court concluded that, pursuant to the sixth amendment, the floor of a sentencing range mattered just as much to the defendant as the ceiling in giving effect to the protections afforded by the constitution. See id., 2161–62 ("It is impossible to dissociate the floor of a sentencing range from the penalty affixed to the crime. . . . [It is an] obvious truth that the floor of a mandatory range is as relevant to wrongdoers as the ceiling." [Citations omitted.]). Although raising the floor "merely limited the judge's choices within the authorized range"; id., 2157–58; it was "impossible to dispute that . . . increasing the legally prescribed floor *aggravate*[*s*] the punishment. . . . Elevating the low-end of a sentencing range heightens the loss of liberty associated with the crime: the defendant's 'expected punishment has increased as a result of the narrowed range' and 'the prosecution is empowered, by invoking the mandatory minimum, to *require the judge to impose a higher punishment than he might wish*.' " (Citations omitted; emphasis altered.) Id., 2161.

In the present case, the majority agrees that "[a]ll mandatory minimum sentences limit, to some extent, the discretion of courts to craft a sentence that accounts for the special characteristics of the offender and the offense. Even mandatory minimum sentences of one or two years limit the discretion of courts by precluding the imposition of lesser sentences on offenders regarded as deserving of a lesser penalty because of compelling mitigating factors." Nevertheless, the majority reasons that, because mandatory minimum sentences allow for the imposition of longer sentences, adult courts sentencing juvenile offenders have sufficient discretion "to choose from a wide range of sentencing possibilities that [equal] or [exceed] the minimum term of imprisonment." According to the majority, that the sentencing court in the present case chose the most

lenient sentence possible, even though "the defendant was subject to a maximum sentence of fifty-five years incarceration on all charges," does not indicate that the defendant was subjected to cruel and unusual punishment.

The sentencing court rejected this claim in its entirety:

"[The Prosecutor]: And your discretion overall, Judge, is ten to fifty [years].

"The Court: I don't know—I'm not certain whether looking at other charges is—as sort of extending my discretion is an appropriate analysis though. If I'm looking at the constitutionality of a sentence available under a particular charge, to say that my discretion has only been marginally narrowed, because there's other charges that I could give consecutive time on, might not be on the mark."

The majority's logic did not prevail in the context of the sixth amendment; see *Alleyne* v. *United States*, supra, 133 S. Ct. 2162–63 (rejecting analogous argument); it follows that, with respect to juveniles, it cannot prevail here, in the context of the eighth amendment. The mandatory transfer statute *automatically* transferring the defendant from juvenile court—where the court had no sentencing floor—to adult court—where a sentencing floor of ten years of incarceration was automatically imposed without regard to the defendant's individual characteristics—raised the floor of the sentencing range and " 'require[d] the judge to impose a higher punishment than he might wish.' " Id., 2161. This violates the mandates of the United States Supreme Court's juvenile sentencing jurisprudence of *Roper*, *Graham*, and *Miller*. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2466 ("[T]he mandatory penalty schemes at issue here prevent the sentencer from taking account of these central considerations [of youth]. By removing youth from the balance—by subjecting a juvenile to the same . . . sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the [sentence] proportionately punishes a juvenile offender."); see also id., 2471 n.10 ("mandatory sentencing schemes . . . by definition remove a judge's or a jury's discretion").

Imposing a floor to which the juvenile defendant would not otherwise have been subject, despite *Miller*'s mandate to consider "an offender's youth and attendant characteristics—before imposing a particular penalty"; *Miller* v. *Alabama*, supra, 132 S. Ct. 2471; "alter[s] the prescribed range of sentences to which a defendant is exposed and do[es] so in a manner that aggravates the punishment." *Alleyne* v. *United States*, supra, 133 S. Ct. 2158. In both *Alleyne* and the present case, the sentencing courts *desired and yet were precluded from* sentencing their defendants below the newly raised sen-

tencing floors. This "[elevation of] the low-end of a sentencing range heightens the loss of liberty associated with the crime"; id., 2161; and renders such sentences unconstitutional.

I would remand this case for resentencing and allow the sentencing court to depart downward from the mandatory minimum sentence it was constrained to impose. The United States Supreme Court's jurisprudence empowers a sentencing court to depart downward from a mandatory minimum sentence when sentencing a juvenile offender. The court, in *Harmelin* v. *Michigan*, supra, 501 U.S. 996, concluded that the eighth amendment contained no guarantee of proportionality with respect to a mandatory minimum sentence and that a sentencing court could not depart downward from a mandatory minimum sentence. *Miller*, however, explicitly carved out an exception to this rule for juvenile offenders. "*Harmelin* had nothing to do with children and did not purport to apply its holding to the sentencing of juvenile offenders. We have by now held on multiple occasions that a sentencing rule permissible for adults may not be so for children. . . . So if (as *Harmelin* recognized) 'death is different,' children are different too. . . . Our ruling thus neither overrules nor undermines nor conflicts with *Harmelin*." (Citations omitted.) *Miller* v. *Alabama*, supra, 132 S. Ct. 2470. After *Miller*, sentencing courts were therefore empowered to depart downward from mandatory minimum sentences imposed on juveniles, which, in some cases, may be the only way a sentence imposed on a juvenile will comport with the eighth amendment. Cf. *People* v. *Hill*, 192 Mich. App. 102, 105, 119, 480 N.W.2d 913 (1991) ("[t]he mandatory minimum is a barrier; it is not a [straightjacket]"), appeal denied, 439 Mich. 922, 480 N.W.2d 909 (1992).

In the present case, in light of the remarks of the sentencing court set forth more fully in part III of this opinion, it is reasonable to conclude that the sentencing court would have departed downward from the mandatory minimum sentence. The sentencing court stated that, "based on its reading of [*Roper*, *Graham*, and *Miller*] and those cases' interpretation of the eighth amendment, [the sentencing court] therefore feels constrained pursuant to those mandatory minimum sentences to impose a sentence in this case which is consistent with the provisions of those mandatory statutes." In my view, the eighth amendment empowers the sentencing court in the present case to depart downward from the mandatory minimum sentence; this court should accordingly remand the case for resentencing.

### C

Lastly, I disagree with the framework applied by the majority to resolve the defendant's eighth amendment claim. The majority does not fully undertake either a gross disproportionality analysis or a categorical analy-

sis, though its analysis appears to lean more toward a gross disproportionality analysis of the defendant's sentence, "comparing the gravity of the offense and the severity of the sentence." *Graham* v. *Florida*, supra, 560 U.S. 60; see also *State* v. *Higgins*, supra, 265 Conn. 62–65 (applying same analysis). I respectfully disagree with the majority's analysis of the defendant's claim.

As discussed previously in part I D of this opinion, there are generally two lines of eighth amendment jurisprudence: (1) cases addressing the proportionality of a term of years sentence given all the circumstances in a particular case; and (2) cases implementing proportionality by imposing a categorical restriction on a certain type of punishment, on the basis of (A) the nature of the offense, (B) the characteristics of the offender, or, (C) as in *Graham* and *Miller*, the sentencing practice implicating the characteristics of the offender. *State* v. *Lyle*, supra, 854 N.W.2d 385–86; see *Graham* v. *Florida*, supra, 560 U.S. 61 ("[H]ere a sentencing practice itself is in question. This case implicates a particular type of sentence as it applies to an entire class of offenders . . . ."); see also *Miller* v. *Alabama*, supra, 132 S. Ct. 2471.

A claim under the first category requires gross disproportionality review which "compar[es] the gravity of the offense and the severity of the sentence." *Graham* v. *Florida*, supra, 560 U.S. 60. This type of review is appropriate if no categorical eighth amendment restrictions apply. See *Adams* v. *State*, 288 Ga. 695, 701, 707 S.E.2d 359 (2011). A claim under the second category— a categorical challenge to a certain type of punishment on the basis of the sentencing practice—requires a different type of review that includes an analysis of objective indicia of society's standards, as expressed in legislative enactments and state practice, and consideration, in this court's own independent judgment, of whether the punishment in question violates the constitution in light of the standards elaborated by controlling precedents and by the Supreme Court's understanding and interpretation of the eighth amendment's text, history, meaning, and purpose. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2470.

The majority's analysis appears to blend the two standards, though it leans more toward gross disproportionality review. After describing the defendant's crime, the majority analyzes the severity of the defendant's sentence, concluding that, "[i]n *Graham*, the court made clear that juveniles convicted of nonhomicide crimes, such as the crimes committed by the defendant in the present case, are not immune from very harsh punishments . . . merely because of their youth when they committed the crimes. . . . [I]t is clear that the court in *Graham* did not disapprove of lengthy sentences for juvenile offenders convicted of nonhomicide crimes . . . . In the present case, the trial court's deci-

sion to impose a sentence for first degree sexual assault that did not exceed the mandatory minimum and to allow the sentences for fourth degree sexual assault and risk of injury to be served concurrently with the sentence for first degree sexual assault was based on its consideration of the defendant's relative youth and immaturity when he committed the crimes . . . . The sentences were therefore consistent with the principle of individualized sentencing and proportionality articulated in *Roper*, *Graham* and *Miller*, and did not constitute cruel and unusual punishment under the eighth amendment." (Citations omitted.) If the majority indeed applied a gross disproportionality analysis, however, it did not indicate whether its review of the crime committed and the sentence imposed led to an inference of gross disproportionality, as is required by our jurisprudence. See *State* v. *Higgins*, supra, 265 Conn. 63–65 (comparing sentence under review with sentences for other crimes, both within this jurisdiction and in other states, only if review of crime and sentence led to inference of gross disproportionality).

Moreover, while the case specific gross disproportionality analysis set forth in *Harmelin* might have been appropriate for an adult's as applied eighth amendment challenge, it is not appropriate in the present case. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2470 ("*Harmelin* had nothing to do with children and did not purport to apply its holding to the sentencing of juvenile offenders. . . . So if [as *Harmelin* recognized] 'death is different,' children are different too. Indeed, it is the odd legal rule that does *not* have some form of exception for children." [Citations omitted; emphasis in original.]); *Graham* v. *Florida*, supra, 560 U.S. 77 ("Another possible approach would be to hold that the [e]ighth [a]mendment requires courts to take the offender's age into consideration as part of a case-specific gross disproportionality inquiry, weighing it against the seriousness of the crime. . . . [E]ven if we were to assume that some juvenile nonhomicide offenders might have 'sufficient psychological maturity, and at the same time demonstrat[e] sufficient depravity,' . . . it does not follow that courts taking a case-by-case proportionality approach could with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change." [Citation omitted.]). The challenge in *Miller* is identical to the challenge in the present case: "The cases before us implicate . . . categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty." *Miller* v. *Alabama*, supra, 2463.

If, instead of performing a gross disproportionality review, the majority performed a categorical review, it omitted any analysis of objective indicia of society's standards, as expressed in legislative enactments and state practice, and consideration, in this court's own

independent judgment, of whether the punishment in question violates the constitution in light of the standards elaborated by controlling precedents and by the Supreme Court's understanding and interpretation of the eighth amendment's text, history, meaning, and purpose. See *Graham* v. *Florida*, supra, 560 U.S. 61. If the majority had performed such a review, it would have shown that our evolving standards no longer support mandatory sentencing schemes for juvenile offenders.

This case is functionally identical to *Miller* and *Lyle*, in which both courts identified the challenges as categorical and analyzed the factors including objective indicia of society's standards, and the like. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2463 ("categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty"); *State* v. *Lyle*, supra, 854 N.W.2d 385 ("a categorical challenge to a term-of-years sentence based on the underlying sentence practice").

I therefore respectfully disagree with the majority's analysis of the defendant's claim.

### III

The sentencing of the defendant in the present case illustrates all of the reasons why this court should adhere to the rationales of *Roper*, *Graham*, and *Miller* and allow sentencing courts to depart downward from mandatory minimum sentences when sentencing juvenile offenders.

The defendant was fourteen and fifteen years old during the series of events leading up to his convictions. A clinical forensic psychologist testified at the defendant's sentencing, noting that the defendant had had a difficult upbringing based on "the number of disruptions in it, [and] the number of traumatic events that occurred in it . . . ." The psychologist detailed the defendant's placements in foster care beginning at age two, and allegations that the defendant had been physically abused, neglected, and mistreated. The sentencing court agreed that this was "another case, it sounds to me, where the abused becomes the abuser."

As described in *Graham* and *Miller*, and with hindsight as a lens, the sentencing court heard testimony about how the defendant might have "impair[ed] the quality of [his own] representation." See *Graham* v. *Florida*, supra, 560 U.S. 78. The defendant rejected multiple plea offers, exhibiting a "[d]ifficulty in weighing long-term consequences; a corresponding impulsiveness; and reluctance to trust defense counsel . . . [that] lead to [his] poor decisions." Id.; see *Miller* v. *Alabama*, supra, 132 S. Ct. 2468 ("[mandatory sentencing ignores the reality] that [the juvenile offender] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, *his inability to deal with . . . prosecutors*

*(including on a plea agreement) or his incapacity to assist his own attorneys*" [emphasis added]).

The defendant in the present case may indeed have impaired his own representation by virtue of his youth: the defendant's mother noted that "[the defendant had been] offered a plea deal by [the prosecutor] and he refused that plea deal. What person in their right mind doesn't take a year and a half, two years knowingly knowing they could get fifty-five years? Does that make any sense to anybody? But I could not talk him into taking a plea deal. No one could talk him into taking it . . . ." The defendant's father also mentioned the defendant's rejection of the plea offers: "[The defendant] had a couple of chances of taking the plea deals. I wish he took them now." The defendant's attorney addressed the issue "about there being an offer and [the defendant] rejecting it, and I would say that is precisely the problem with having fourteen year olds and fifteen year olds in adult court facing the consequences of twenty, twenty-five years maximum incarceration on one count with ten years mandatory minimums. They're idiots. They're kids. They don't make rational decisions. If they did, we wouldn't be here."

The defendant, armed with the hindsight that comes only after a few years of maturity, yet still only nineteen years old, addressed the sentencing court: "Your Honor, I'd like to point out that at the time that I was accused of this stuff, I was a kid. I still am a kid. I'm sorry. I was offered two years and a half or however long it was and thinking about that is, like—thinking about it now is crazy, but it was just back then I was so focused on the fact that I was going to become some kind of monster. I was going to become a sex offender. I was going to become someone that you Google online and there they are. And I didn't want to become that type of person because that's not who I am. I was offered two years and three months and now I'm facing ten years. I mean, it's just such a huge gap. It's not fair. That is my whole young life. I mean, I'm sorry this all happened, but I didn't want to go to a trial. I mean, I wanted to prove my innocence, Your Honor, and I wasn't found innocent. I don't know what else to say."

Even if the sentencing court had specifically found that the defendant in the present case had materially impaired the quality of his own defense because of his youth, the majority expressly prevents the sentencing court from acting on such a finding. The sentencing court expressly noted that "we can . . . disagree on what youth means, [but] I think we would all agree that the defendant is not particularly experienced in the criminal justice system and the decision that he [made to go to trial instead of plead] was a difficult one." The majority, instead, acquiesces to the realities identified in *Graham* and *Miller*, and exhibited in the present

case, that a juvenile defendant very well might have been charged with a lesser offense or received or taken a plea if he or she had not failed to adequately aid in his or her defense because of the incompetencies of youth.

Even if the defendant had not been offered a plea deal, the appropriateness of his punishment cannot be established by reference to the judgment of our legislature. This court should not acquiesce to the use of mandatory minimum sentences on juvenile offenders because such minimums were *crafted to punish adult offenders*. This violates the United States Supreme Court's mandate "that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Miller* v. *Alabama*, supra, 132 S. Ct. 2471; see also id., 2473 (imposition of mandatory penalties on juveniles having been mandatorily transferred to adult court " 'does not indicate that the penalty has been endorsed through deliberate, express, and full legislative consideration' "); *Graham* v. *Florida*, supra, 560 U.S. 67 ("[T]he fact that transfer . . . laws make [adult sentences] possible for some juvenile nonhomicide offenders does not justify a judgment that many [s]tates intended to subject such [juvenile] offenders to [adult] sentences. . . . [States with these transfer laws] should not be treated as if they have expressed the view that the [adult] sentence is appropriate." [Citation omitted.]); *State* v. *Lyle*, supra, 854 N.W.2d 403 ("[the constitution] prohibits the one-size-fits-all mandatory sentencing for juveniles"). Such mandatory sentences "overpower mitigating arguments based on youth *as a matter of course*, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe . . . ." (Emphasis added.) *Roper* v. *Simmons*, supra, 543 U.S. 573. As the defendant's attorney noted, neither "justice [n]or anybody is served by taking a [thirteen year old] and fourteen year old boy and saying to him that you have to be incarcerated as an adult in an adult correctional facility . . . ."

With respect to the penological justifications of the defendant's sentence, the defendant, seemingly having lacked the maturity to prepare his defense, can hardly be said to have possessed the maturity to appreciate his actions at the time of the offenses. As for deterrence, juveniles "are less likely to take a possible punishment into consideration when making decisions [and] [t]his is particularly so when that punishment is rarely imposed." *Graham* v. *Florida*, supra, 560 U.S. 72; see also *State* v. *Lyle*, supra, 854 N.W.2d 399 ("[A] deterrence rationale is actually *even less applicable* when the crime [and concordantly the punishment] is lesser [than that of *Graham* or *Miller*]. If a juvenile will not engage in the kind of cost-benefit analysis involving the death penalty that may deter them from committing a

crime, there is no reason to believe a comparatively minor sentence of a term of years subject to a mandatory minimum will do so." [Emphasis in original.]). Despite the rarity of the sentence imposed in the present case,[2] despite the decreased deterring effect of this sentence on others, and despite the mandates of *Roper*, *Graham*, and *Miller* requiring this court to "take into account how children are different, and how those differences counsel against" a mandatory sentence; *Miller* v. *Alabama*, supra, 132 S. Ct. 2469; the majority nevertheless finds no reason to question the soundness of the penological justification of the sentence. The majority precludes the sentencing court from considering that the defendant's sentence may do little to deter future juvenile offenders from committing the same crime.

As for retribution for the crime charged, the majority agrees that a juvenile's culpability may indeed be lesser than that of an adult.[3] See Id., 2465; *Graham* v. *Florida*, supra, 560 U.S. 68; *Roper* v. *Simmons*, supra, 543 U.S. 571. Nevertheless, the majority believes that, despite a juvenile offender's categorically decreased culpability, a sentencing court's discretion to impose a *greater sentence* than a mandatory minimum sentence sufficiently safeguards a juvenile's constitutional right to proportionate punishment. No matter that a sentencing court, to adequately proportion the punishment to the juvenile's *actual* culpability, wishes instead to *depart downward* from the mandatory minimum sentence.

With respect to incapacitation, the majority precludes the sentencing court from being able to impose a sentence that would incapacitate the juvenile defendant on the basis of his actual proclivities for future crime in light of the characteristics of his youth and any demonstrated maturity brought on by just a few years of time. Instead, the majority acquiesces to a sentence that incapacitates the juvenile defendant on the basis of the length of time an *adult* should be incapacitated. See *State* v. *Lyle*, supra, 854 N.W.2d 400 ("[a] close reading of *Graham* demonstrates the fact that the Supreme Court views the incapacitation rationale even more limitedly: the [c]ourt recognized Florida needed to incapacitate the youthful offender to the extent he 'posed an immediate risk' of 'escalating [his] pattern of criminal conduct' "), quoting *Graham* v. *Florida*, supra, 560 U.S. 73.

As for rehabilitation, the majority maintains that the legislature's judgment for how to rehabilitate an *adult offender*, made at the outset of a *juvenile offender's* sentencing and without adjustment for such juvenile's traits, is penologically sound. Yet, the legislature's judgment about how to rehabilitate a juvenile offender, if made on the basis of the same judgment it uses for adult offenders, "is not appropriate in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability." *Graham* v. *Florida*, supra, 560 U.S.

74. Imposing the same adult sentence both ignores and perpetuates " '[t]he inadequacy of the adult criminal system to address the emotional and developmental needs of teenagers [which] is substantiated through research demonstrating that youth incarcerated in adult facilities are more likely to reoffend and commit more serious crimes than youth who are tried and treated in the juvenile system for the same crimes.' " *In re Tyriq T.*, 313 Conn. 99, 132, 96 A.3d 494 (2014) (*Eveleigh, J.*, dissenting), quoting Conn. Joint Standing Committee Hearings, Judiciary, Pt. 19, 2007 Sess., p. 6096; see also *State* v. *Lyle*, supra, 854 N.W.2d 400 ("[j]uvenile offenders who are placed in prison at a formative time in their growth and formation . . . can be exposed to a life that can *increase* the likelihood of recidivism" [citation omitted; emphasis added]).

Unfortunately, despite the sentencing court's own "misgivings about the appropriateness of mandatory minimum sentences particularly within the context of the sentencing of juvenile offenders, the court [was] compelled, based upon its own reading of the relevant law"—a reading adopted by the majority—to impose a mandatory minimum sentence that wholly ignored the defendant's youth despite the fact that the United States Supreme Court "requires [us] to take into account how children are different" during the sentencing process. *Miller* v. *Alabama*, supra, 132 S. Ct. 2469. With all that *Roper*, *Graham*, and *Miller* explained about how juveniles are constitutionally different than adults in the sentencing context, how juveniles, categorically, may be less culpable than adults, and how the eighth amendment "mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty"; id., 2471; the majority would hold that the sentencing court should be unable to adjust a juvenile defendant's sentence downward because of such juvenile's age, in the sentencing court's words, "*even if* the defendant's young age counseled in favor of a more lenient sentence." (Emphasis in original.)

It is reasonable to conclude that the sentencing court would have departed downward from the mandatory minimum sentence in light of its remarks during sentencing. After hearing testimony, the sentencing court appeared unable to justify, penologically, the sentence the court felt constrained to impose on the basis of its reading of the law: "Regardless of the extent to which the state had discretion to act otherwise [in transferring the case to the regular criminal docket pursuant to General Statutes § 46b-127], regardless [of] the extent that the law should be different than it is, regardless of whether . . . there should be an age at which offenders are . . . brought to the adult court, whatever personal opinions may be on that subject, the court has ruled that there is no constitutional violation in the Connecticut sentencing scheme or in the fact that we

do authorize the transfer of certain offenses committed by persons fourteen years . . . and older to adult court.

"What is not before me now and what has never been before me is the question of whether . . . this was a case that should have come here, should have stayed here. The fact is it came here, in the court's view . . . so that issue was also really one that's beyond the court's ability or authority to effect. It . . . is a decision that was made by [the state's attorney in] whom that discretion was placed.

\* \* \*

*"I, frankly, don't know whether many judges have been previously in this state confronted with a situation where an offender as young as your client at the time of the offenses was in the position that I am now which is to be required to impose a sentence where there is a mandatory minimum like that which is at issue here. So a certain part of me shares your . . . wish to be somewhere else, but this is what I have the duty to do.*

\* \* \*

"[A]s I said in my . . . memorandum, *I have, frankly, certain misgivings about the appropriateness of mandatory minimum sentences in the juvenile setting.* . . . So I'm not speaking out of school, so to speak, by saying that sitting up here now with a mandatory minimum in place doesn't make things easier. But there are . . . rules that all of us have to follow and, under our system of law, the legislature enacts the laws and the courts are duty bound to enforce them. . . .

"Of course, with a mandatory minimum, there's a point at which I have to impose a certain sentence. It's always hard to say what would be the right number of years to compensate someone for what [the complainant] went through. There's no right number. There's no magic to this. *But I still have to impose what the legislature tells me to impose. I don't have any other choice. . . . But, very candidly, in this case, the sentence that I have to impose, at least the minimum sentence I have to impose, is set by the legislature.*

\* \* \*

"[D]espite my own misgivings about the appropriateness of mandatory minimum sentences particularly within the context of the sentencing of juvenile offenders and of the belief, as I am, that *when the legislature enacted this mandatory minimum they were not contemplating, frankly, a fourteen year old, but probably someone significantly older, I still feel duty bound under my role in our criminal justice system to follow the rules and the sentences the legislature has enacted. But to the extent that people have asked me to be as lenient as I can, that's what I'm being. I'm being as*

*lenient as I can*." (Emphasis added.)

The sentencing court's words speak volumes, eloquently focusing our attention on the inequities, of a constitutional magnitude, that arise when we treat juvenile offenders as adults. In my view, these words amount to a finding that the sentence imposed on the defendant was unconstitutionally disproportionate, constituting cruel and unusual punishment.

The majority's review of the proportionality of the defendant's sentence is devoid of any mention of all that the sentencing court saw, firsthand, to be an inappropriate application of our age blind mandatory minimum sentences to this particular juvenile defendant. I would agree with the majority that, in the abstract, a ten year sentence may not be a per se cruel and unusual punishment, and that such a punishment is certainly less severe than those at issue in *Roper*, *Graham*, and *Miller*. See *Robinson* v. *California*, 370 U.S. 660, 667, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962) ("To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract."). "Even one day in prison would be a cruel and unusual punishment" if the punishment did not fit the offense or the offender. Id.

However, by stepping back and abstractly reviewing the length of the defendant's sentence with the length of the sentences in *Graham* and *Miller*, the majority fails to recognize the reality that the sentencing court found this sentence to be disproportionate for this juvenile offender, after a nuanced review of all of the particular circumstances in this defendant's case. Despite that finding, the trial court was precluded from adjusting the sentence downward from the mandatory minimum sentence that the legislature had crafted for an adult convicted of this crime to account for this juvenile defendant's diminished culpability. Respectfully, in my view, this is a step backward from what was, and is, a national trend of recognizing that juveniles cannot be treated the same as adults when meting out punishments.

In my view, there is an inherent contradiction in the conclusion that, on the one hand, we must protect juveniles convicted of the most terrible crimes from life sentences because juveniles possess characteristics that render them in need of our special protection, and yet, on the other hand, these same juveniles, possessing the same characteristics that render them in need of our special protection, are not entitled to the same protection on the basis of their having committed different crimes. It was this inconsistency that the court in *Miller* attempted to avoid when it stated, in no uncertain terms, that "none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-spe-

cific." *Miller* v. *Alabama*, supra, 132 S. Ct. 2465.

I respectfully dissent.

[1] Iowa's mandatory transfer statute required the defendant in *Lyle* to be tried and sentenced as an adult. Iowa's transfer statute, like Connecticut's, requires that juveniles charged with certain enumerated crimes be automatically tried and sentenced as adults. See General Statutes § 46b-127; Iowa Code Ann. § 232.8.1 (c) (West 2015). Iowa's transfer scheme differs with Connecticut's, however, in that its automatic transfer provisions become applicable at age sixteen, compared with age fourteen in Connecticut, and that a defendant is empowered to challenge such transfer, compared with the defendant's inability to challenge such transfer in Connecticut. See General Statutes § 46b-127; Iowa Code Ann. § 803.5.2 (West 2015).

[2] According to the information provided in the defendant's appendix, for incarcerated juvenile offenders in 2013, the defendant was the youngest child, in terms of his age at the time of the offense, sentenced in this state for the crime charged.

[3] The majority specifically focuses, however, on "the gravity of these offenses, the tender age of [the complainant] when they occurred, and the likelihood that [the complainant] will suffer from the effects of the abuse for the remainder of his life" in concluding that "the mandatory minimum sentences cannot be said to be disproportionate under *Roper, Graham* and *Miller*." While these considerations make a strong case for retribution, absent from this review is any mention of *the defendant's* characteristics, particularly the sentencing court's clear view that the defendant's characteristics weighed in favor of a lesser sentence. See *Graham* v. *Florida*, supra, 560 U.S. 71 (" '[t]he heart of the retribution rationale is that a criminal sentence *must be directly related to the personal culpability of the criminal offender*' " [emphasis added]), quoting *Tison* v. *Arizona*, supra, 481 U.S. 149.